INTERNATIONAL UNION OF          )
OPERATING ENGINEERS, LOCAL 150  )
AFL-CIO,                        )
                                )
          Plaintiff             )
                                )
          v.                    )    Case No. 2:06 cv 280
                                )
HOBART CRANE RENTAL, INC., a    )
Corporation; HOBART WELDING &   )
FABRICATION, INC., a Dissolved  )
Corporation; TRIPLE "C"         )
CONSTRUCTION EQUIPMENT LEASING, )
LLC., and X-PRESS CRANE         )
COMPANY, LLC., a Limited        )
Liability Company,              )
                                )
          Defendants            )

## OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment [DE 41] filed by the plaintiff, International Union of
Operating Engineers, Local 150, AFL-CIO ("Local 150"), on August
11, 2008.  For the reasons set forth below, the motion is **DENIED
IN PART** and **GRANTED IN PART.**

## Background

The background to this matter is, in part, taken from this
court's prior orders addressing the defendants' first Motion for
Summary Judgment and defendants' Second Motion for Summary
Judgment.  (Op. and Order July 19, 2007; Op. and Order August 22,
2008)  Hobart Welding and Fabrication was owned and operated by
Robert Czarny.  (Compl. ¶ 4; Ex. C, p. 4)  Incorporated in 1978,
the company grew, and by 1991, Hobart Welding was a non-union
company engaged in the fabrication and installation of steel

beams used in residential construction. (Deft. Memorandum, Ex. A, p. 1) Hobart Crane Rental, a separate company, was incorporated in 1982. (Compl. Ex. C, p. 4) This company, engaged in the rental of cranes and operators to various contractors, was owned by Czarny's wife at that time, Linda. (Compl. Ex. C, p. 4)

On May 22, 1991, Hobart Crane Rental executed a memorandum of agreement with International Union of Operating Engineers, Local 150 AFL-CIO. By the terms of the agreement, Hobart Crane became subject to the collective bargaining agreement in place between Local 150 and the Calumet Building Association. (Compl. ¶¶ 7, 8) This agreement established a grievance and arbitration procedure that required the parties to enter a three-step process before a dispute reached arbitration. (Compl. ¶ 9) According to the agreement, the arbitrator's decision was binding on the parties to the master agreement. (Compl. ¶ 9)

The agreement also required the employer to pay specified rates to any employee in the bargaining unit for a minimum of two hours once the employee reported for work with the signatory employer. (Compl. ¶ 9) If the employee began work, the employer was obligated to compensate the employee for an eight-hour day at the union rate regardless of the amount of time actually spent on the job. (Compl. ¶ 9)

In March 1999, a dispute arose between Hobart Crane and Local 150 which the parties did not resolve at the intermediate steps in the grievance process. The dispute centered upon two non-union Hobart Welding employees, Larry Mason and Jeffrey

2

Bonick, who were issued union permits to work as crane operators for Hobart Crane.  (Compl. Ex. A, p. 1)  On occasion, Bonick and Mason were assigned to work as crane operators for less than a full day, and upon completing this work, returned to work for the balance of the day at the lesser, Hobart Welding, non-union wage rate.  (Compl. Ex. A, p. 1)  After approximately two years, Mason and Bonick informed their employer that this pattern violated the collective bargaining agreement's eight-hour provision.  (Compl. Ex. A, p. 2)  Subsequently, Mason and Bonick were notified that Hobart Crane could not afford to pay them under this requirement, and both were laid off.  (Compl. Ex. A, p. 2)

These events were the basis for a complaint before the National Labor Relations Board, alleging unfair labor practice under 29 U.S.C. §158(a).  On  January 4, 2001, NLRB Administrative Law Judge Marion C. Ladwig determined that Hobart Crane did not meet the NLRB's jurisdictional standard of more than $50,000 in inflow or outflow.  The ALJ concluded that "although Hobart Crane continually violated its collective bargaining agreement and concealed the violations from the Union," he could not conclude that laying off Bonick and Mason was motivated because they assisted the Union and engaged in concerted activities, constituting an unfair labor practice.  See 29 U.S.C. §158(a)(3).  The ALJ's decision was upheld on May 20, 2001.

In the midst of this grievance process, Czarny created Triple C, a non-union S-corporation which leased out heavy equipment, as well as X-Press, an owner/operator business with

Czarny as sole member and owner. According to the defendants, Linda Czarny and Lisa Minder were employees of Triple C and handled payroll and secretarial functions while Czarny directed and supervised the employees. Triple C's business address was listed as Czarny's home address. Triple C leased equipment to Calumet Crane and X-Press, including a crane purchased from Hobart Welding upon its dissolution and two boom trucks purchased from Hobart Crane. (Deft. Resp. p. 7) X-Press was a non-union crane rental business and rented out cranes with an operator just as was done by Hobart Crane. X-Press also listed Czarny's home address as its location. All of the equipment owned by Triple C and used by X-Press, as well as the phone number used to reach both, were located at the same Hobart address used by Hobart Crane and Hobart Welding.

On April 10, 2001, the parties returned to the grievance process required by the collective bargaining agreement regarding the company's violations of the eight-hour provision. (Compl. ¶ 11) Because the dispute was not resolved by the Joint Grievance Committee, it was submitted to binding arbitration. (Compl. ¶ 11)

On May 30, 2002, arbitrator Neil M. Gundermann issued an arbitration award. (Compl. Ex. C, p. 36) The arbitrator noted that the employees were paid a lesser rate, the rate associated with the non-union company, Hobart Welding, when they were not operating a rented crane but were engaged in other activities required to install the steel beam. (Compl. Ex. C, p. 6)

4

According to the grievants, this arrangement - splitting the employees' hours in a given day between the two companies based upon their hour-by-hour activity - violated the collective bargaining agreement's eight-hour provision.  On behalf of Mason and Bonick, Local 150 further argued that Hobart Welding was the alter ego of Hobart Crane and, consequently, also liable. However, the arbitrator was "not persuaded [that Hobart Crane] and Hobart Welding are a single employer or that Hobart Welding is the alter ego of [Hobart Crane]."  (Deft. Ex. GG, p. 35)  The arbitrator concluded that Hobart Crane violated the collective bargaining agreement with regard to Bonick and Mason.  (Compl. Ex. C, p. 36)  The arbitrator described the work that these employees did for Hobart Crane for which they were paid according to the rates established by the collective bargaining agreement, including the time spent operating rented cranes.  (Compl. Ex. C, p. 6)

The arbitrator's written decision of May 30, 2002, culminated with the following award:

> 1.  That the Company violated the collective bargaining agreement when it failed to pay the grievants, Mason and Bonick, for eight hours on days when they performed bargaining unit work from the effective date of the collective bargaining agreement until they were laid off.
>
> 2.  The Company is ordered to make the grievants whole by paying the grievants the difference between what they were paid on those days they performed bargaining unit work operating and maintaining Company owned equipment and the rate they should have been

> paid under the terms of the collective bar-
> gaining agreement.
>
> 3. The Company is ordered to make the con-
> tractually mandated contributions to the
> various funds specified in the collective
> bargaining agreement for those hours which
> the Company must pay the grievants pursuant
> Number 2 above.
>
> (Pltf. Ex. GG, p. 36)

Although the second Award item was not quantified, Local 150
contended that this amount could be determined from one of two
formulas and produced a damage amount for each individual some-
where between $24,000 and $56,000.

Following the arbitrator's award, the parties engaged in
settlement discussions which were unsuccessful and led to the
scheduling of a second hearing before the arbitrator. (See *Local
150 v. Hobart Crane, et. al.*, 2:04 CV 53, DE 1, ¶ 19) This
hearing was scheduled to be held in February 2003, but was
cancelled a few days beforehand on the suggestion that the
parties had reached an agreement on settlement terms. However,
one year later, this settlement had not been finalized, and Local
150 filed a complaint in federal court seeking enforcement of an
oral settlement agreement. Following discovery in that action,
Local 150 amended the complaint and rephrased the remedy it
sought as the enforcement of the arbitration award rather than
the enforcement of an oral settlement agreement.

On October 17, 2004, Hobart Crane filed for Chapter 7
bankruptcy. The matter was discharged on June 8, 2005. In the
bankruptcy proceeding, Hobart Crane listed Local 150 as a credi-

tor for one dollar with respect to 2002 union dues, Neil M. Gundermann for $1,679.50 for fees as arbitrator in 2002, and William E. Dugan, Local 150 president, also for one dollar regarding 2002 union dues.

On August 17, 2005, the parties stipulated to the dismissal of the prior federal cause of action without prejudice and took the matter back to the arbitrator. In their stipulation, the parties noted that "should defendants fail to pay the arbitration award, plaintiffs will file another lawsuit against the defendants." (*See Local 150*, 2:04 CV 53, DE 85, p. 2)

On November 22, 2005, approximately three and one-half years after his original award, the parties again were before Gundermann, and on May 15, 2006, Gundermann issued a "clarification of an arbitration award." He stated that the purpose of the clarification was to address the prior award's statement of the remedy, which had required Hobart Crane to pay Mason and Bonick the difference between their actual pay and what they were entitled to under the collective bargaining agreement. The task was complicated by the defendant's destruction of all payroll records, which Czarny indicated was done on the advice of his accountant. (Compl. Ex. D, p. 5)

In the Complaint in this matter, Local 150 characterizes the arbitrator's formula as providing the grievant with "the difference between their weekly work hours and the closest number divisible by eight." Without illustrating how the projection was reached, Local 150 then states that this new formula produces the

greatly reduced damage award between $4,300 and $9,500. (Compl.
¶ 18) Local 150 seeks the vacation of the arbitrator's clarifi-
cation and an award from this court of $56,810.70 for Bonick and
$34,939.23 for Mason, which it characterizes as "consistent with
the undisputed, unrefuted evidence presented at the November 22,
2005 arbitration." (Compl. ¶ 17)

The defendants have filed and been denied two motions for
summary judgment. In the first, Hobart Crane alleged that this
court lacked jurisdiction over the matter. Summary judgment on
those grounds was denied because Hobart Crane had expressly
invoked the court's jurisdiction, and the jurisdiction here was
not decided by the NLRB determination. In the second, the
defendants argued that the bankruptcy proceeding discharged the
debt to Local 150. Summary judgment was denied both because
nothing in the record suggested that the awards to Bonick and
Mason were discharged in the bankruptcy proceeding and because
the possibility of successor liability after the bankruptcy
raised a question of fact.

Here, Local 150 requests summary judgment on both the
vacation of the arbitrator's clarification of award and the issue
of successor or alter ego liability of Hobart Welding, Triple C,
and X-Press for the award due from Hobart Crane.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary
judgment is proper only if it is demonstrated that "there is no
genuine issue as to any material fact and the moving party is

entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986); *Williams v. Excel Foundry & Machine, Inc.*, 489 F.3d 309, 310 (7th Cir. 2007); *Treadwell v. Office of the Illinois Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003). Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.

1999); ***Plair v. E.J. Brach & Sons, Inc.***, 105 F.3d 343, 346 (7th

Cir. 1997); ***United Association of Black Landscapers v. City of***

***Milwaukee***, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court

must determine whether the evidence presented by the party

opposed to the summary judgment is such that a reasonable jury

might find in favor of that party after a trial.

> The inquiry performed is the threshold in-
> quiry of determining whether there is the
> need for a trial--whether, in other words,
> there are any genuine factual issues that
> properly can be resolved only by a finder of
> fact because they may reasonably be resolved
> in favor of either party.
>
> [T]his standard mirrors the standard for a
> directed verdict under Federal Rule of Civil
> Procedure 50(a), which is that the trial
> judge must direct a verdict if, under the
> governing law, there can be but one reason-
> able conclusion as to the verdict.
>
> ***Anderson***, 477 U.S. at 250, 106 S.Ct. at 2511

*See also* ***Scott v. Harris***, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167

L.Ed.2d 686 (2007)("When opposing parties tell two different

stories, one of which is blatantly contradicted by the record, so

that no reasonable jury could believe it, a court should not

adopt that version of the facts for the purposes of ruling on a

motion for summary judgment."); ***Celotex Corp.***, 477 U.S. at 322-

23, 106 S.Ct. at 2553; ***Branham***, 392 F.3d at 901; ***Lawrence***, 391

F.3d at 841; ***Hottenroth***, 388 F.3d at 1027 (stating that a genuine

issue is one on which "a reasonable fact finder could find for

the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327
F.3d 569, 573 (7th Cir. 2003).

Before continuing, a minor housekeeping matter must be
addressed. On November 19, 2008, the defendants filed a "Re-
sponse to Plaintiff's Motion to Strike and, in the Alternative,
Motion for Leave to File Sur-Reply." [DE 52] This pleading re-
quests that "[s]hould this Court find that Plaintiff is not
required to adhere to Local Rules 56.1(d) and 7.1 and file a
separate Motion to Strike, Defendants move this Court to allow
Defendants to file a Sur-reply[.]"  This pleading discusses Local
150's reply to the summary judgment motion, which points out that
the defendants failed to conform to Local Rule 56.1's instruction
to include a "Statement of Genuine Issues" and asks the court to
limit such issues to those listed under the heading "Disputed
Facts" in the defendants' response.

Local Rule 56.1 states that the response "shall include *in
its text or appendix thereto* a 'Statement of Genuine Issues'
setting forth, with appropriate citations to discovery responses,
affidavits, depositions, or other admissible evidence, all
material facts as to which it is contended there exists a genuine
issue necessary to be litigated."  The clearly enumerated and
cited "Disputed Facts" listed in the defendants' response suf-
fice, and the court has considered them.  However, the defen-
dants' proposition that these Disputed Facts are "not meant to be
all inclusive" is counter to the Rule's clear instruction to list
*all* material facts in dispute.  Because Local 150's reply never

11

was construed by the court as a Motion to Strike, the alternative request to allow defendants to file a sur-reply is moot.

The first issue to address is whether the clarification of the award by the arbitrator draws its essence from the collective bargaining agreement. Local 150 contends that it does not, but rather that Hobart Crane failed to meet its shifted burden of proof at the hearing after failing to keep records of the hours worked by Bonick and Mason and that the arbitrator's remedy was illogical. The defendants' Disputed Facts do not address this issue. Rather, the defendants rely on the imposing standard of review required to overturn an arbitration award.

"Litigants attempting to overturn an arbitrator's award face a daunting challenge." ***ANR Advance Transportation Co. v. International Brotherhood of Teamsters, Local 710***, 153 F.3d 774, 777 (7th Cir. 1998). *See also* ***Amax Coal Co. v. United Mine Workers of America, International Union***, 92 F.3d, 571, 575 (7th Cir. 1996) ("It is well established that judicial review of arbitration awards under collective bargaining agreements is extremely narrow." (citing cases)). The Supreme Court has discussed that when "[c]ollective-bargaining agreements . . . provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances," the "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." ***United Paper-***

***workers International Union v. Misco, Inc.***, 484 U.S. 29, 36, 108
S.Ct. 364, 98 L.Ed.2d 286 (1987). The Supreme Court went on to
state:

> [T]he arbitrator's award settling a dispute
> . . . must draw its essence from the contract
> and cannot simply reflect the arbitrator's
> own notions of industrial justice. But as
> long as the arbitrator is even *arguably con-*
> *struing or applying the contract* and acting
> within the scope of his authority, that a
> court is convinced he committed serious error
> does not suffice to overturn his decision.
>
> ***United Paperworkers***, 484 U.S. at 38, 108
> S.Ct. at 364

The Seventh Circuit further has explained that "it is only
when the arbitrator must have based his award on some body of
thought, or feeling, or policy, or law that is outside the
contract that the award can be said not to draw its essence from
the [collective bargaining agreement]." ***ANR Advance***, 153 F.3d at
777 (*citing* ***Jasper Cabinet Co. v. United Steelworkers of America,***
***AFL-CIO-CLC, Upholstery & Allied Division***, 77 F.3d 1025, 1028
(7th Cir. 1996)(internal quotes omitted)). Judge Kenneth Ripple
described the role of the court as one "not to substitute our
judgment for the arbitrator or even to determine that the arbi-
tration was legally or factually in error; instead, we must limit
our inquiry to whether the arbitrator reached his decision
through an interpretation of the CBAs." ***ANR Advance***, 153 F.3d at
778. He concluded:

> If the arbitrator attempted to give meaning
> to the terms of the contract, then the award
> drew its essence from the CBAs and we shall
> not disturb it. Moreover, we resolve any

> reasonable doubt about whether an award draws
> its essence from the collective bargaining
> agreement in favor of enforcing the award.
>
> ***ANR Advance***, 153 F.3d at 778 (*citing* and
> *quoting **Polk Brothers, Inc. v. Chicago Truck
> Drivers, Helpers & Warehouse Workers Union
> (Independent)***, 973 F.2d 593 (7th Cir. 1992)
> (internal quotes omitted))

Judge Richard Posner further elaborated on the "judicial reluc-
tance . . . to set aside a labor arbitrator's award" and the
freedom of an arbitrator to choose his own interpretive rules in
applying the terms of a collective bargaining agreement.  ***Inter-
national Truck and Engine Corp. v. United Steel Workers of
America, Local 3740***, 294 F.3d 860, 863 (7th Cir. 2002).  In
***International Truck***, he stated that "as long as the arbitrator
was interpreting the parties' contract . . . the award must stand
*even if the arbitrator's interpretation was actually a misinter-
pretation.*"  294 F.3d at 861.  Only if there is "no possible
interpretive route to the award, so that a noncontractual basis
can be inferred, may the award be set aside."  ***International
Truck***, 294 F.3d at 861 (*citing* and *quoting **Chicago Typographical
Union No. 16 v. Chicago Sun-Times, Inc.***, 935 F.2d 1501, 1506 (7th
Cir. 1991))(internal quotes omitted).

   In ***International Truck***, the collective bargaining agreement
stated that where the company had reasonable cause to believe
that an employee was under the influence of drugs, the employee
would be required to submit to a urine or blood test, and any
refusal to cooperate would constitute insubordination resulting
in immediate termination.  Anonymous tips of illegal drug use of

an employee to the company and the subsequent discovery of drug residue on that employee's car and work area prompted the company to request a drug test. Upon refusal, the employee was fired. The arbitrator interpreted the agreement to allow firing for failure to cooperate only if there was reasonable cause to believe that the employee was under the influence of drugs at the very moment the test was requested. Though this interpretation of the agreement gave the narrowest, most literal, and "quite possibly wrong," interpretation of the agreement, the very fact that this was his interpretation of the collective bargaining agreement required that it be upheld. 294 F.3d at 863. Although the arbitrator appeared to "ignore contextual factors that point-ed to the wisdom" of a different interpretation, he was not "disregarding the contract in favor of his own views of labor relations or workplace safety." 294 F.3d at 863.

Here, the court agrees with Local 150 that the arbitrator's mathematical answer to the clarification of the award missed the point of the eight-hour workday clause in the collective bargain-ing agreement. Clearly, the clause was meant to force the employer to pay for a full day at the union wage once an employee started any of the collective bargaining unit work. The evidence provided by Local 150 demonstrated that Bonick and Mason did union work at the start of a vast majority - almost all - work days. As an example, if the employee completed two hours of union work each day in a five day week, he should have been paid all 40 hours at the union rate. However, under Gundermann's

clarified award, those ten hours of union work would be rounded
up to 16 hours of union wages, with the remaining 24 hours left
at the non-union rate, awarding the difference on only six hours.
If the evidence offered regarding the percentage of time Bonick
and Mason spent as part of their day on union work was remotely
accurate, this method of calculation awarded the workers much
less than they deserved to be paid.

But that likely shortchanging of Bonick and Mason is irrele-
vant. The standard of review does not allow this court to vacate
Gundermann's interpretation even if it is "quite possibly wrong,"
so long as his calculation was based on some interpretation of
the collective bargaining agreement. Here, Gundermann incontro-
vertibly discussed and applied the eight-hour rule, and although
his mathematical application ran counter to the calculations
proposed by the union, his decision did not disregard the con-
tract in favor of his own views of labor relations or workplace
safety.[1] He simply found a unique way to apply the rule to the
facts before him. Like the extremely narrow, literal interpreta-
tion upheld in *International Truck*, here, too, the arbitrator's
interpretation met the standard of being drawn from the essence
of the agreement. Summary judgment on Local 150's request for
the court to vacate the arbitration award is **DENIED**.

The next issue is whether Hobart Welding, Triple C, and X-

---

[1] For example, Gundermann did not determine that it would place an
unfair burden on the employer to require the company to pay eight hours in
wages when the employee only worked two hours.

Press can be held liable as successor or alter ego entities for the award debt of Hobart Crane. In this regard, the parties have inundated the court with exhibits. The dispute boils down to "he said-she said" versions of the facts, with Local 150 providing reams of documents which support characterization of the entities as successors or alter egos, while the defendants rely on deposition testimony of the Czarnys which denies such relationship between the business entities.[2]

The defendants also propose that because Local 150 failed to present the theory that Hobart Crane and Hobart Welding operated as a single employer or alter egos during the second arbitration hearing, the union is precluded from raising this argument now. Local 150 points out that the court approved stipulation and dismissal of the previous lawsuit, as well as this court's opinions on the defendants' first and second motions for summary judgment, all confirm that the possibility of successor liability remains an unanswered question.

Collateral estoppel, or issue preclusion, limits the litigation of issues that have been decided between parties in a prior

---

[2]The court's task of digesting the exhibits offered with the briefings was not aided by the parties. An inordinate number of cites were to entire exhibits, leaving the court to sift through on its own in an attempt to locate the necessary information. Several cites simply were wrong - leading the court on a treasure hunt through depositions, searching for a statement or series of statements to support a fact asserted by the party. The citing method adopted by Local 150 involved using the initials of deponents followed by the year of the deposition and the page cite, rather than using the simple exhibit letters and page numbers - leaving it to the court to translate "LCD 2005 Exs. 6, 8-10" to Ex. K, L-N. All this searching is a waste of the court's time and a burden properly belonging to the parties, not the court.

action, and it applies only when the same issue is involved in the two proceedings and the determination of that question is "essential" to the prior judgment. *King v. Burlington Northern & Santa Fe Ry. Co.*, 538 F.3d 814, 818 (7th Cir. 2008). The Supreme Court recently reiterated the requirements for issue preclusion, noting that "[i]ssue preclusion . . . bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, ___ U.S. ___, 128 S.Ct. 2161, 2171, 171 L.Ed.2d 155 (2008). According to the Seventh Circuit, collateral estoppel applies when: (1) the issue sought to be precluded is the same as that involved in a prior action; (2) that issue actually was litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action. *Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 530 (7th Cir. 1997).

Local 150 had its opportunity to litigate the issue of whether Hobart Crane and Hobart Welding were a single employer or that Hobart Welding was an alter ego of Hobart Crane when it argued the issue before Gundermann in 2002. The issue sought to be precluded here, single employer or alter ego status, is the same as that arbitrated. The issue actually was litigated in the forum designated by the collective bargaining agreement, arbitra-

18

tion.  The determination was essential to the final judgment, the
award, imposed by the arbitrator, and Local 150 was fully repre-
sented in the arbitration.  All of the issue preclusion factors
have been fulfilled.  Gundermann's conclusion was clear:  he was
not persuaded that Hobart Crane and Hobart Welding were a single
employer, and he did not find that Hobart Welding was an alter
ego of Hobart Crane.  When Local 150 sought rehearing before
Gundermann for clarification of the award in 2005, this issue of
Hobart Welding as a single employer with Hobart Crane or as an
alter ego apparently was not discussed.

Local 150 asserts in its reply that the defendants attempted
this issue preclusion argument in both prior summary judgment
motions and that this court denied the argument both times.  This
is an inaccurate portrayal of the issues before the court in both
cases.  In the first denial, this court applied issue preclusion
to the question of jurisdiction, concluding that the issue was
not precluded because the standards for jurisdiction are differ-
ent under the NLRB and the federal courts, and therefore, the
issue was not the same.  In the second denial, Local 150 pointed
to the court's statement that the parties' stipulation included
an agreement that "should the defendants fail to pay the arbitra-
tion award, plaintiffs will file another lawsuit against the
defendants."  Nothing in this statement negated the opportunity
for the defendants to argue issue preclusion based on the
arbitrator's earlier decision once the lawsuit is filed.  Because
the parties voluntarily entered binding arbitration as part of

the collective bargaining agreement, the factors of issue preclu-
sion have been fulfilled, and the court is reluctant to interfere
with the outcome of those contractual solutions to labor dis-
putes, the court will not reopen these issues as to Hobart Weld-
ing.  Local 150 is precluded from re-litigating the issues of
Hobart Welding as a single employer with Hobart Crane and Hobart
Welding as an alter ego of Hobart Crane.  However, nothing from
Gundermann's decisions mentioned findings or conclusions in
regard to Triple C and X-Press, so the question of whether those
entities may be liable for the award due from Hobart Crane is
viable.

Although Local 150 has amalgamated its legal analysis and
arguments that Hobart Welding, Triple C, and X-Press are alter
ego employers, successors, and/or comprise a single employer with
Hobart Crane, the three claims for liability differ:

> [T]he alter ego and successorship inquiries
> are distinct.  Whether one employer is a
> successor of another depends on a number of
> factors, some of which were recently enunci-
> ated by this court, including whether:
>
> [a] there has been a substantial continuity
> of the same business operations; [b] the new
> employer uses the same plant; [c] the same or
> substantially the same work force is em-
> ployed; [d] the same jobs exist under the
> same working conditions; [e] the same super-
> visors are employed; [f] the same machinery,
> equipment, and methods of production are
> used; and (g) [sic] the same product is manu-
> factured or the same service is offered[.]
>
> Of course, there is not, and can never be,
> however, a formal definition of a successor.
> The determination in each case involves the
> facts and the labor policy at issue.

By contrast, the alter ego doctrine focuses
on the existence of a disguised continuance
of a former business entity or an attempt to
avoid the obligations of a collective bar-
gaining agreement, such as through a sham
transfer of assets.  In sum unlawful motive
or intent are critical inquiries in an alter
ego analysis.

Both of the doctrines are usually applied to
determine whether one employer is required to
bargain with a union that represented a for-
mer employer's employees.  However, we see no
reason the same principles should not be
applicable to enforcement of arbitration
awards that are part and parcel of the col-
lective bargaining process itself. (internal
cites, quotes, and footnotes omitted)

*International Union of Operating Engineers,
Local 150, AFL-CIO, v. Centor Contractors,
Inc.*, 831 F.2d 1309, 1312-13 (7th Cir. 1987)

*See also* **International Union of Operating Engineers, Local 150,
AFL-CIO, v. Rabine**, 161 F.3d 427, 433 (7th Cir. 1998)(listing the
seven factors that the NLRB has said are relevant to an alter ego
claim: substantially identical management, business purpose,
operation, equipment, customers, supervision, and ownership)
(*citing* **Crawford Door Sales Co.**, 94 L.R.R.M. 1393, 1393-94
(1976)).

"The single employer doctrine, in contrast to the successor-
ship and alter ego doctrines, is used to determine whether two
presently existing entities are in fact so related that they
should be treated as one employer for purposes of collective
bargaining." **Centor Contractors**, 831 F.2d at n.2.  Simply put,
an alter ego, or any related employers making up a single em-
ployer, may be liable for an employer's violation of law or

21

contract, including the refusal to pay an arbitration award born of a collective bargaining agreement. *See* **Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.**, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965)(setting out this basic notion). Because case law often merges the concepts and factors of the single employer doctrine and the alter ego doctrine, all of the above factors will be discussed. *See* **Rabine**, 161 F.3d at 433 (discussing alter ego factors in case involving union collective bargaining agreement negotiations with one entity while thinking that a second existing entity should be bound).

The proper questions as to Triple C and X-Press are whether Triple C became a successor to Hobart Welding when it acquired all of the assets of Hobart Welding, and whether X-Press is an alter ego to Hobart Crane, thereby making the two newer entities liable for the award entered against Hobart Crane. However, because Hobart Welding has been found neither to be a single employer nor an alter ego of Hobart Crane, the question is narrowed to the issue of whether X-Press is an alter ego of Hobart Crane. Local 150's Motion for Summary Judgment as to the liability of Triple C as an alter ego or successor of Hobart Crane is **DENIED.** In addition, because the defendants' disputed facts are limited to those nine enumerated in their response, the court

need only address those of the nine which involved the status of X-Press.

22

Looking at the body of facts established as a whole in a light most favorable to the defendants, the court can apply the alter ego factors to the relationship between Hobart Crane and X-Press. Local 150 has provided facts supporting the proposition that X-Press is a continuation of the same business, the rental of cranes with operators, to the same customers that were served previously by Hobart Crane. Although the defendants assert in their ninth disputed fact that the customers are different, nothing cited supports this as to X-Press. The contention that Triple C only has two customers and that Czarny works as a crane operator do not dispute the facts asserted by the union that X-Press is servicing the customers previously served by Hobart Crane. The location of X-Press is also undisputed because the "official" address listed on business records is less important than where the business actually fields phone calls and keeps its equipment. Likewise, the fact that the prior address of Hobart Crane is now owned by a trust is meaningless. It is clear in the evidence that X-Press is using the same location previously used by Hobart Crane.

The assertions that X-Press utilizes the same employees formerly working for Hobart Crane, as well as the contention that those employees are doing the same services, is undisputed. Last, X-Press appears to be utilizing the same equipment once used by Hobart Crane. The cranes previously owned by Hobart Welding which are now owned by Triple C and leased to X-Press are the same.

The alter ego analysis is not complete without inquiring into motive or intent. Although difficult to conclude that X-Press was formed with the intent to continue the operations of Hobart Crane in a manner to avoid the award from the arbitration, the circumstantial evidence of such an unlawful motive is apparent here. The use of Czarny's home address which is within an upscale residential neighborhood as the location for his industrial crane business suggests an intent to mislead. Similarly, the timing of the origination of X-Press during the grievance process and just one month before the grievance was submitted to binding arbitration reveals a disguised intent.

Nothing in the Disputed Facts of the defendants contests these findings as to X-Press. Because X-Press fulfills the factors constituting an alter ego continuation of Hobart Crane, Local 150's Motion for Summary Judgment as to the liability of X-Press for the award due from Hobart Crane is **GRANTED.**

---

For the foregoing reasons, the Motion for Summary Judgment [DE 41] filed by the plaintiff, International Union of Operating Engineers, Local 150, AFL–CIO, on August 11, 2008, is **DENIED IN PART** and **GRANTED IN PART.**

ENTERED this 30th day of April, 2009

s/ Andrew P. Rodovich
   United States Magistrate Judge